SPEARMAN *v.* STATE.

No. 41284          January 4, 1960          116 So. 2d 823

*Jesse M. Coleman,* Aberdeen, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Kyle, J.

The appellant, Henderson Spearman, was indicted for murder and was tried and convicted and sentenced to life imprisonment in the state penitentiary. From that judgment he prosecutes this appeal. The homicide occurred during the early morning hours of December 14, 1958. The appellant and James Ivy, the deceased, are both members of the Negro race.

The main points argued by the appellant's attorney as ground for reversal of the judgment of the lower court are: (1) That the court erred in refusing to grant the appellant's request for a directed verdict at the

conclusion of all of the evidence; and (2) that the court erred in overruling the appellant's motion for a new trial on the ground that the verdict of the jury was against the great weight of the evidence.

It is therefore necessary that we give a brief summary of the testimony.

Richard Joseph, a member of the Aberdeen police force, testified that he received a telephone call during the early morning of December 14, 1958, informing him that a shooting had occurred at Coleman Hodges' house on West Canal Street in the City of Aberdeen and that he and police officers Russell Newman and Edward Jones went to the scene of the shooting immediately. They found the body of James Ivy lying on a bed in the west room of the Coleman Hodges' house. The deceased had been shot in the chest, and was dead when the officers arrived. The officers found a gun in the corner of the bedroom. The gun had been fired one time. Joseph stated that the Hodges's house was a 4-room house located on the north side of the street and faced southwardly. Ivy lived in the west side of the house, and Coleman Hodges lived in the east side. There was a front porch on the south side of the house and doors leading from the porch into each of the two apartments. There were no lights on the front porch. Several people were in the house when the officers arrived; and the officers found out from them who had done the shooting. The officers then went to the house where the appellant lived, which was about two blocks from the Coleman Hodges' house. Some one opened the door at the side of the house, and the appellant came out. The appellant appeared to be running when he came out of the house, but when he saw the officer's gun he stopped. The officers then took the appellant in the house and asked him where his gun was. The appellant denied that he owned a gun. The officers lifted the mattress on the bed in the room and found a 16-gauge barrel shotgun,

which had been fired only a short time before the officers arrived. The appellant admitted that the gun belonged to him, but stated that he did not know it was there. The officers placed the appellant under arrest and drove back to the Coleman Hodges' house. The appellant then admitted that he had shot the deceased, but stated that the deceased had fired first.

Edward Jones testified that he was with officers Joseph and Newman when the investigation was made. Jones stated that an empty shotgun shell was found on the porch, and another empty shell was found behind the house about 30 feet from the end of the porch. The appellant told the officers where he unloaded his gun, and that was exactly where they found the other shell. From the information which the officers obtained from the people who were present when the officers arrived, it appeared that there had been gambling in the Hodges.' apartment during the night, that an argument had started, and that Ivy had slapped the appellant. The appellant told the officers that he was standing on the ground at the corner of the porch when he fired his shotgun at the deceased. Russell Newman's account of the investigation was substantially the same as that of the other two officers. Newman stated that the shell from Ivy's gun was lying on the porch right at Ivy's door, and from the physical examination which he made of the premises it appeared that the shot which killed Ivy came from the east corner of the porch.

Harvey McNairy testified that he was at Coleman Hodges' apartment the night the shooting occurred. Several other people were present. There was some drinking going on in the apartment, and McNairy and others were engaged in a dice game. Henderson Spearman was seated in a chair, and Ivy got up and knocked him out of the chair. Spearman started to get up and Ivy hit him again. Other parties got between them and Spearman walked out the door. Ivy then went to his room on

the other side of the house. Spearman returned 15 or 20 minutes later with a shotgun, and came to the door of Hodges' apartment and looked in. Hodges told him to get out with the shotgun, and he immediately went out. Ivy had not come back into the Hodges' apartment and was not in there when Spearman returned with the shotgun. McNairy stated that it was about five minutes after Spearman left the door of the Hodges apartment, maybe not that long, when he heard two shots "fired about like that," snapping his fingers. Nathan Hodges testified that he was in the Coleman Hodges' apartment when the killing occurred. He did not see the fight which marked the beginning of the difficulty. He was asleep at that time. But he saw Spearman when he came back to the house with the gun. Spearman walked up and looked in, and Coleman Hodges said to him, "Don't come in with that gun, I aint going to have that mess in here." Spearman turned around and walked out. After that, two shots were heard, "Boom, Boom, about like that."

Will Thomas testified that he was in James Ivy's apartment at the time of the shooting. He arrived at the apartment about 20 minutes before the shooting occurred. James was there in his room at that time. James' brother, Otis, and Otis' wife, Louise, were also there. Thomas stated that he knew nothing about what had happened between Spearman and James Ivy prior to his arrival at James' apartment. But he heard Spearman ask Coleman Hodges whether James was in, and Coleman told him, "No." He then heard the door slam, and James Ivy got up and got his shotgun and started out the door. Thomas told James not to go out there, but James kept going. Thomas heard two shots just as James got out of the door. The shots sounded, "Boom, Boom, like that." There was no light on the porch. After the two shots were fired James came back in the door. Thomas saw that he was about to fall, and he and

James' brother laid him on the bed. James died a few minutes later. Thomas stated that he did not see Spearman at any time that night, but he heard Coleman Hodges tell Spearman, who was in the next room, to get out.

Joe T. Monaghan, the sheriff, testified that he was notified of the killing about 3:30 A. M. Sunday morning. He went to the funeral home to examine the dead body, and on the following day, took a written statement from the appellant, which was offered in evidence.

Three witnesses testified for the appellant, and the appellant testified in his own behalf.

Coleman Hodges testified that he lived in the east side of the double apartment house, and that James Ivy and his brother, Otis, and Otis' wife, Louise, lived in the west side of the house. Hodges stated that he was in the house at the time Ivy and Spearman became involved in an argument over money. Spearman asked Ivy for his money. Spearman said, ''I want my money tonight,'' and Ivy slapped Spearman twice. Spearman then left the apartment, and Ivy also left. Hodges did not know what happened on the outside, but Spearman came back 15 or 20 minutes later, and he had his gun with him when he came back. He came to the front door of Hodges' apartment, and Hodges told him not to come in. Hodges' Uncle Nathan also told Spearman not to come in. The shooting occurred a few minutes later. Two shots were fired close together. On cross-examination Hodges admitted that there had been crap games in progress during the night, and all of the boys had been drinking liquor. Hodges stated that he knew that Spearman was mad at Ivy — everybody knew that. Hodges did not see Ivy with a gun at any time. George Collins testified that he was present when the argument started inside the house, but he did not see any licks pass. Spearman walked out of the house and Ivy followed him. When they got out on the ground Ivy said

to Spearman, "I am getting tired of you all running over me like this;" and Ivy slapped Spearman. Spearman then left and went on toward his home. Collins was not at Coleman Hodges' place when Spearman came back with his gun. Adolph Sims testified that he was at Coleman Hodges' house the night the homicide was committed, but that he was about drunk and didn't know anything much about what occurred. He heard Spearman ask Ivy what he slapped him for, and Ivy cursed Spearman. Sims stated that he did not see Spearman any more that night; but he heard a gun fire, and it sounded like to him that there was only one shot.

The appellant, Henderson Spearman, testified that he went over to Coleman Hodges' house about 5:30 P. M. Other persons came in during the evening, and a dice game was started about 7:30 that night. The dice game continued until a late hour. James Ivy "threw a twelve" and "got up and cussed," and struck the appellant twice. The appellant walked out of the house, and Ivy walked out behind him. Ivy hit the appellant again with his fist when they were on the outside, and Ivy opened his knife and told the appellant that "if he opened his mouth he would cut his guts out." The appellant then went home and got his gun and came back to Coleman Hodges' apartment. Hodges told him to get out of there with the gun. The appellant stated that when he backed out of Coleman Hodges' apartment, Ivy was standing in the door of his own apartment with his gun down beside him. The appellant jumped behind the corner of the house, and Ivy shot and the appellant shot. Ivy shot first, and the appellant shot to protect himself. The appellant stated that he was standing on the ground at the east end of the porch when he shot the deceased. Ivy was standing in his door at the west end of the porch. The appellant stated that he did not go back to Coleman Hodges' house with the intention of killing Ivy; that he carried his gun because he was afraid of him;

and that the reason he told the officers, when they came to arrest him, that he did not have a gun was that he was scared.

The appellant's attorney argues that the appellant was the only eyewitness to the actual shooting; that the appellant's version of the killing was reasonable and was not contradicted in any material particulars by any of the witnesses who testified for the State or by the physical facts; and that, under the rule laid down in Weathersby v. State, 165 Miss. 207, 147 So. 481, the appellant was entitled to the peremptory instruction requested by him at the conclusion of the evidence.

But we think there was no error in the court's refusal to grant the appellant's request for a directed verdict of not guilty at the conclusion of all the evidence. It is true that the appellant was the only eyewitness who testified concerning the movements of the appellant or the deceased at the time of the actual shooting. But the question as to the appellant's guilt or innocence was not to be determined entirely by the appellant's evidence as to what took place at the time of the actual shooting. There were other facts and circumstances in the case bearing on the appellant's guilt, which the jury had a right to consider in determining the question as to the appellant's guilt or innocence of the crime charged against him. The testimony of the State's witnesses and the testimony of the appellant himself showed that the deceased had made an assault upon the appellant and had slapped the appellant twice only a few minutes before the homicide; and that the appellant, after being so assaulted and beaten, had gone to his own house about two blocks away and had armed himself with a shotgun and had returned to the Coleman Hodges apartment, where he expected to find the deceased, and had shot the deceased while the deceased was standing in the door of his own apartment. These facts, which were clearly established by the testimony

of the witnesses who were present in the Coleman Hodges apartment at the time the fatal shot was fired, when considered along with the testimony of the police officers who inspected the scene of the killing and arrested the appellant after the shooting occurred, were in our opinion sufficient to warrant the conclusion that the appellant provoked the difficulty which resulted in the killing of the deceased.

The jury had a right to believe from the evidence that the appellant, angered by the assault and battery committed upon him by the deceased, went to his home and armed himself with a shotgun and returned to the Coleman Hodges house with the intention of obtaining revenge for the wrong done him, and, if necessary, to kill the deceased; that such design and purpose on the part of the appellant was premeditated; and that the appellant was the aggressor in the fatal encounter. And if the jury so found the facts to be, as they doubtless did, the jury was warranted in finding that the appellant had forfeited his right of self-defense, and the appellant was guilty of murder under the law. Helm v. State, 67 Miss. 562, 7 So. 487; Prine v. State, 73 Miss. 838, 19 So. 711; Grady v. State, 144 Miss. 778, 110 So. 225. In other words, the jury was justified in disbelieving the appellant's testimony wherein it differed from the other facts and circumstances proved. In our opinion the appellant was not entitled to a directed verdict of not guilty. Neither do we think that the verdict was against the great weight of the evidence.

We find no reversible error in the record, and the judgment of the lower court is therefore affirmed.

Affirmed.

*Roberds, P. J.,* and *Arrington, Ethridge* and *Gillespie, JJ.,* concur.